UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .
                                   .
          Plaintiff,               .  CR No. 19-0007 (TSC)
                                   .
     v.                            .
                                   .
MASOUD KHAN,                       .  Washington, D.C.
                                   .  Tuesday, August 13, 2019
          Defendant.              .  10:30 a.m.
. . . . . . . . . . . . . . . . .


TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:          SEJPAL S. CHAWLA, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street NW
                             Washington, DC 20530
                             (202) 252-7566


For the Defendant:           DAVID B. BENOWITZ, ESQ.
                             Price Benowitz LLP
                             409 Seventh Street, NW
                             Suite 200
                             Washington, DC 20004
                             (202) 271-5249


Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001
                             (202) 354-3186




Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

```
1                    P R O C E E D I N G S
2           THE DEPUTY CLERK:  Your Honor, we have criminal
3    action 19-07, United States of America versus Masoud Khan.
4    We have Mr. Tejpal Chawla representing the government,
5    Mr. David Benowitz representing the defendant, who is present,
6    and Ms. Carmen Perez representing Probation.
7           THE COURT:  Good morning.
8        Mr. Chawla, is there any reason why the sentencing should
9    proceed under seal?
10          MR. CHAWLA:  No, Your Honor.  We had filed a joint
11   motion yesterday --
12          THE COURT:  I saw that.  I just signed that motion.
13          MR. CHAWLA:  We can --
14          THE COURT:  I mean I've just granted that motion.
15          MR. CHAWLA:  Then I have no objection to keep --
16          THE COURT:  Okay.  Let's unseal this, and you can let
17   the family in.  (Courtroom unsealed.)
18       We're unsealing.  Is there family here?
19          MR. BENOWITZ:  Yes.
20          THE COURT:  They can come in.  (Spectators enter.)
21       Come on in.
22          MR. BENOWITZ:  And, Your Honor, with respect to the
23   -- the motion that was filed does not include two entries that
24   I anticipate being entered, but I don't believe that they --
25          THE COURT:  Two what?
```

1        MR. BENOWITZ:  Two docket entries.  Because the

2    letters that I received late on Sunday -- and I filed that

3    yesterday -- would not been included in the motion.  But they

4    don't include any of the information that would require being

5    sealed.

6        THE COURT:  All right.

7    Good morning, everyone.  We're starting late, and

8    I apologize for that.  We had some delays this morning.

9        The case has now been called, and we are here for the

10   sentencing of the defendant, Mr. Masoud Khan, who has pleaded

11   guilty to False Statements Involving International Terrorism,

12   in violation of Title 18 § 1001(a)(2) of the United States Code.

13       Mr. Benowitz, I had told you this the last time we were

14   here, that I require sentencing materials a week before the

15   sentencing because I read the sentencing materials several

16   times.  I try and put a lot of thought into sentencing, which

17   I'm always saying is the hardest part of my job, and I like to

18   consider everything.

19       And I got the letters -- I know you may have received them

20   Sunday, but I didn't get them till this morning, which means I

21   had to read them this morning, you know, less than half an hour

22   before I'm sentencing Mr. Khan, which is note optimal.  It's not

23   fair to Mr. Khan, and it's not fair to me.  And it's not fair to

24   the government either.

25       MR. BENOWITZ:  Right.  No, I understand, Your Honor.

1    And, Your Honor, in retrospect, I apologize for not e-mailing

2    it to chambers.

3            THE COURT:  Yeah.  I mean, they're materials sent

4    in support of Mr. Khan, and they deserve my full consideration.

5    I did read them, but you know --

6            MR. BENOWITZ:  Well, Your Honor, of course I did

7    not know that --

8            THE COURT:  -- there are judges who might not --

9            MR. BENOWITZ:  No, I understand, Your --

10           THE COURT:  -- if they come after the deadline.

11           MR. BENOWITZ:  -- Honor.  I just didn't know there's

12   a 24-hour delay also from when we file to when they --

13           THE COURT:  Right.  Anything you want, especially

14   sentencing materials, which I read repeatedly, personally --

15           MR. BENOWITZ:  Sure.

16           THE COURT:  -- I need -- I can't be reading them on

17   the morning of sentencing.  I did in this case, but I don't

18   like being put in that position.  So I have read them.

19           MR. BENOWITZ:  I understand, Your Honor.

20           THE COURT:  Okay.  Let me tell you what I have

21   received and reviewed in anticipation of the sentencing.

22   I've received and reviewed the presentence report and sentencing

23   recommendation from the probation department and also the

24   following documents that were submitted by counsel:

25       A copy of the plea agreement signed by Mr. Khan, that's

ECF No. 22; a copy of the statement of offense signed by
Mr. Khan, ECF No. 29; Mr. Khan's sentencing memorandum, which is
ECF No. 30, which includes letters from Cemal Gumus, Mr. Khan's
prayer leader; Rafi Uddin Ahmed, Mr. Khan's friend; Mahmoud
Khan, Mr. Khan's father; Habib Tora, Mr. Khan's cousin; and
Safiya Samman, Mr. Khan's friend.

I've also reviewed Mr. Khan's supplemental sentencing
memorandum, which is ECF No. 31, which included a letter from
Mr. Khan himself; the government's sentencing memorandum, which
is ECF No. 32, which included a letter from Mr. Khan to a
suspect in this case.

And this morning defense counsel provided three additional
letters to the Court, and the Court has reviewed letters from
Khadija Khan, Mr. Khan's sister; Fatema Khan, Mr. Khan's sister;
and Hasina Khan, Mr. Khan's wife.

I've also this morning spoken to the probation officers
assigned to this case, and I will disclose my conversations
with them to you as we get further along in the process.  The
conversations weren't based on any information you all don't
already have.  In fact, I'll just tell you now.

I was basically discussing with them Mr. Khan's options
for counseling and anti-extremism treatment were he to get a
custodial sentence and the probation office's resources for
providing Mr. Khan with counseling and treatment related to his
extremism and radicalization while he is on supervised release.

1    So that's what that was about.

2         So, Mr. Khan, good morning.  How are you?

3              THE DEFENDANT:  Good morning.

4              THE COURT:  How are you feeling?

5              THE DEFENDANT:  I'm doing fine.

6              THE COURT:  All right.  Actually, have a seat.

7    Speak into the microphone.

8         Make sure it's on, Mr. Benowitz, please.

9              MR. BENOWITZ:  Sure.

10             THE COURT:  Is your head clear today, Mr. Khan?

11             THE DEFENDANT:  Yes.  I'm fine.

12             THE COURT:  Now, remember at your plea hearing we

13   proceeded in three steps, and this sentence is going to proceed

14   in four steps.  The first is for me to go over the presentence

15   report and determine whether there are any objections, the

16   second is for me to determine what sentencing guidelines and

17   sentencing range applies to your case, and the third is for me

18   to hear from the government, from any -- well, there won't be

19   any victims being heard from.

20        Is there going to be any evidence at all you're presenting

21   Mr. Chawla?

22             MR. CHAWLA:  No, Your Honor.  I'm just going to be

23   reading just two pieces of information that are in the public

24   record.  Small, brief statements, but nothing --

25             THE COURT:  All right.  I'm going to hear from your

1    lawyer, Mr. Benowitz, and if you would like to speak, I'll

2    certainly be happy to hear from you.  I've read your letter,

3    so you don't have to speak.  If you decide not to speak, that's

4    fine.  I won't hold it against you.  If you do want to speak,

5    I'll listen to what you say.  Okay?  So it's totally your

6    decision.

7                THE DEFENDANT:  Okay.

8                THE COURT:  And the last step is the hardest part,

9    at least for me, which is I have to come up with what I consider

10   to be a fair and just sentence in light of the factors set forth

11   in the statute at 18 U.S.C. § 3553(a).

12        So with regard to the presentence report, the final

13   presentence report and sentencing recommendation were filed in

14   this matter on June 27, 2019.

15        Mr. Chawla, does the government have -- I don't know if --

16   pursuant to the Circuit's recent decision, we're going to start

17   filing the recommendations as well.  You're going to start

18   getting the recommendation with the presentence report, but you

19   didn't get it automatically in this case, did you?

20               MR. CHAWLA:  The presentence report?

21               THE COURT:  The recommendations.

22               MR. CHAWLA:  No, I did not.

23               THE COURT:  I will disclose that to you as we move

24   along, but the final presentence report and the sentence

25   recommendation were filed with me on June 27, 2019.

1          Mr. Chawla, do you have any objection to any of the factual

2     determinations set forth in the presentence report?

3               MR. CHAWLA:  I do not, Your Honor.  I did just also

4     want to confirm.  You mentioned the items you reviewed.  The

5     government filed a supplemental memorandum under seal.

6               THE COURT:  Yes.  I thought I mentioned those.

7               MR. CHAWLA:  I thought you mentioned the defense

8     supplement, but I just wanted --

9               THE COURT:  All right.  I also received the

10    government's supplemental memorandum, yes.

11              MR. CHAWLA:  And also, just to aver that the

12    government's sentencing memorandum referred to the complaint

13    in this case, that was the complaint affidavit?  So to the

14    extent that there were references in one that --

15              THE COURT:  I've looked at that.  Yes.

16              MR. CHAWLA:  Thank you, Your Honor.

17              THE COURT:  All right.

18              MR. CHAWLA:  But no objections.

19              THE COURT:  Okay.

20         Mr. Khan, let me ask you first, are you fully satisfied

21    with the services of your attorney, Mr. Benowitz, in this case?

22              THE DEFENDANT:  Yes.

23              THE COURT:  All right.  You sure?

24              THE DEFENDANT:  Yes, ma'am.

25              THE COURT:  All right.  Do you feel you've had enough

1    time to talk to him about the presentence report and the papers

2    that were filed by the government in connection with the

3    sentencing?

4                THE DEFENDANT:  Yes.

5                THE COURT:  You sure?

6                THE DEFENDANT:  Um, can you say that one more time?

7                THE COURT:  Do you feel you've had enough time to

8    discuss your case with Mr. Benowitz?

9                THE DEFENDANT:  Yes.

10               THE COURT:  All right.  You sure?

11               THE DEFENDANT:  Yes.

12               THE COURT:  Okay.  Again, remember I think I told

13   you this -- I did tell you this at your plea.  If you have a

14   question or there's something you don't understand, you could

15   take a pause and ask your lawyer about it.  You can still do

16   that here today.  I don't want you to just feel like you want

17   to get this over with and just go along with stuff you don't

18   understand.  Okay?

19               THE DEFENDANT:  Okay.

20               THE COURT:  All right.

21        Mr. Benowitz, have you and Mr. Khan read and discussed the

22   presentence report?

23               MR. BENOWITZ:  Yes.

24               THE COURT:  Are there any disputed issues of fact?

25   That is, does Mr. Khan have any objection to any of the factual

statements set forth in the presentence report?

MR. BENOWITZ:  Your Honor, we made several factual corrections that were incorporated in paragraphs 52 to 64 and 67.  Other than that, we don't have any --

THE COURT:  In terms of the final version, you don't have any objections to any --

MR. BENOWITZ:  No.

THE COURT:  All right.  Hearing no objection to the final presentence report, I will accept the factual recitation in the presentence report regarding the circumstances of the offense, and therefore the facts as stated in the presentence report will be my findings of fact for the purposes of this sentencing.

Now we're going on to the second step, which is the determination of the guidelines.  The presentence report lays out the probation office's calculation of the advisory guideline range that applies in this case.  This calculation was done using the 2018 guidelines manual and is as follows:

Beginning with the guidelines offense level, the applicable guideline in this case is United States Sentencing Guideline §2J1.2, which has a base offense level of 14.

Twelve levels are added because Mr. Khan was convicted under 18 U.S.C. § 1001(a)(2), and the statutory maximum of eight years' imprisonment applies because the matter relates to international terrorism.

1    Two additional levels are added because Mr. Khan willfully

2    obstructed or impeded, or attempted to obstruct or impede, the

3    administration of justice with respect to the investigation,

4    prosecution, or sentencing of the instant offense of conviction,

5    and the obstructive conduct related to Mr. Khan's offense of

6    conviction and any relevant conduct or closely related offense.

7    The 14 additional levels brings Mr. Khan's adjusted offense

8    level to 28.

9        The government has represented that Mr. Khan has

10   demonstrated acceptance of responsibility in a manner that

11   entitles him to a two-level reduction under §3E1.1(a) and

12   that Mr. Khan assisted authorities in the investigation and

13   prosecution of this matter in a manner that entitles him to

14   an additional one-level reduction under §3E1.1(b).

15       Therefore, before any consideration of any departures or

16   variances, Mr. Khan's total offense level is 25 as I calculate

17   it, and I agree with the probation office's calculation.

18       Is there any objection to this calculation?  Mr. Chawla?

19            MR. CHAWLA:  No, Your Honor.

20            THE COURT:  Mr. Benowitz?

21            MR. BENOWITZ:  No, Your Honor.

22            THE COURT:  Now, I will note that in Mr. Khan's

23   letter to the Court, ECF No. 31, he does state, "I don't think

24   a double enhancement is fair for the international terrorism and

25   obstruction of justice."  But defense counsel has not lodged

1    any objection in its sentencing memorandum.  My view is that

2    Mr. Khan's opinion of the fairness of the double enhancement or

3    what he calls a double enhancement is his opinion, but you're

4    not mounting a legal challenge to it at this time, Mr. Benowitz?

5              MR. BENOWITZ:  No, Your Honor.

6              THE COURT:  Turning to the applicable criminal history

7    category, the presentence investigation has found that Mr. Khan

8    has one prior conviction that receives criminal history points

9    in the guidelines manual.  I think that's a conviction for

10   possession of marijuana.  Is that it?

11             MR. CHAWLA:  Yes, Your Honor.

12             THE COURT:  This conviction gives Mr. Khan a

13   criminal history point total of 1, and this puts him in a

14   criminal history category of I.

15        Are there any objections to this criminal history category,

16   Mr. Chawla?

17             MR. CHAWLA:  No, Your Honor.

18             THE COURT:  Mr. Benowitz?

19             MR. BENOWITZ:  No, Your Honor.

20             THE COURT:  Okay.  Based on the offense level and

21   criminal history category I've just discussed, the presentence

22   report calculates the guidelines sentencing range to be 57

23   months to 71 months of imprisonment.

24        Now, having determined the applicable guidelines range,

25   the next step is for me to consider departures.  While the

presence report does not include any departure grounds,

the government seeks a 10-level departure pursuant to U.S.

Sentencing Guideline §5K1.1 because Mr. Khan has provided

substantial assistance to the government.

In considering the departure, the Court's consideration

includes the following:  The Court's evaluation of the

significance and usefulness of the defendant's assistance,

taking into consideration the government's evaluation of the

assistance rendered; the truthfulness, completeness, and

reliability of any information or testimony provided by the

defendant; the nature and extent of the defendant's assistance;

any injuries suffered or any danger or risk of injury to the

defendant or his family resulting from his assistance; and the

timeliness of the defendant's assistance.

Counsel, Mr. Chawla, can you speak to these factors?

MR. CHAWLA:  Yes, Your Honor.  Can we approach the

bench?

THE COURT:  Yes.

(Sealed Bench Conference.)





1  ███████████████████████████████████████████████

2  ███████████████████████████████████████████████

3  ██████████████████████████████████████████████

4  ███████████████████████████████████████████████

5  ███████████████████

6           ██████████████

7           ████████████████████████████████████████

8  ████████████████████

9           ███████████████████████

10          ██████████████████

11          (End of bench conference.)

12                  THE COURT:  All right.  Thank you all.

13          All right.  Having reviewed the government's written

14  submission and heard from the government and Mr. Benowitz under

15  seal regarding the extent of Mr. Khan's cooperation, I do find

16  on the record before me that a 10-level departure is warranted

17  in this case.

18          The basis for my decision under the factors enumerated

19  above, I find that the defendant provided a significant and

20  useful and unusual level of cooperation to the government.

21  I am satisfied that the government, based on other matters,

22  that it was truthful, that it was extensive, and that the

23  defendant obviously places himself in a vulnerable position

24  based on that.  And it was timely.

25          So do the parties wish to assert any other bases for a

1    departure as opposed to a variance?

2             MR. CHAWLA:  Not from the government, Your Honor.

3             MR. BENOWITZ:  No, Your Honor.

4             THE COURT:  All right.  Having reviewed all bases for

5    a departure, the Court determines that Mr. Khan's total offense

6    level is now 15.  With a criminal history category of I,

7    Mr. Khan's guidelines range is now 18 months to 24 months of

8    imprisonment.

9        Now, § 3553 requires me to consider a variety of factors

10   including the sentencing range the guidelines prescribe, which

11   I've just discussed, and also the applicable penal statutes.

12   The charge of False Statements Involving International Terrorism,

13   in violation of Title 18 § 1001(a)(2) of the United States Code,

14   carries a statutory maximum penalty of eight years of imprisonment.

15       While under the applicable statute you are eligible for

16   probation, Mr. Khan, you are ineligible for probation under the

17   guidelines because the applicable guideline range is Zone D of

18   the sentencing table.

19       If I impose a term of imprisonment, the statutes provide

20   that Mr. Khan faces a supervised release range following

21   imprisonment of up to three years, while under the guidelines

22   that range is one to three years.  So as I told you at your

23   plea, the most supervised release you could get is three years.

24       The statute of conviction sets a maximum fine of up to

25   $250,000, while the guidelines fine range is between $7,500 and

$75,000.  A special assessment of $100 per count is mandatory, and the statutory and guidelines restitution provision are inapplicable because there is no identified victim here.

Counsel, have I stated accurately the statutory and guidelines framework under which we're operating in this case? Mr. Chawla?

MR. CHAWLA:  Yes, Your Honor.

THE COURT:  Mr. Benowitz?

MR. BENOWITZ:  Yes, Your Honor.

THE COURT:  All right.  Now, before I discuss the other sentencing factors, I want to notify the parties of the particular sentence the probation office has recommended taking into account the guidelines range, the available sentences, and all the factors in § 3553(a).  I will tell you that this recommendation -- and Probation will correct me if I'm wrong -- this recommendation was not based on the government's recommendation for a downward departure.  Is that correct?

PROBATION OFFICER:  Yes, Your Honor.

THE COURT:  Okay.  So this was before the government's motion for a downward departure.  The probation office recommends 57 months of imprisonment and 36 months of supervised release, which was the bottom level of the range prior to the downward departure.  The recommendation of the probation office is not based on any facts and circumstances that have not already been revealed to the parties in the presentence report.  Probation

1   office also recommends 36 months, which is three years, of

2   supervised release.

3        All right.  At this point I'm going to give the parties an

4   opportunity to address the Court on the sentencing guideline

5   range and any other factors that bear on my consideration of a

6   fair and just sentence.  Mr. Chawla?

7        MR. CHAWLA:  Thank you, Your Honor.  I think it's

8   important to sort of see why we're here, how we got to this

9   point, because that, from the government's point of view, opens

10  up the lens as to how we should be looking at sentencing for

11  him  too.

12       Mr. Khan has an ideology and a belief, a predisposition

13  and a view of radical Islamic thinking which leads him to want

14  to become a martyr.  That's why he reached out to S-1, the

15  suspect in this case, the Jamaican cleric.  That person is a

16  very dangerous person.

17       And to put it lightly, the fact that Mr. Khan came into

18  his orbit, communicated with him regularly and opened up to

19  him that he wanted to do Jihad, meaning fight violently abroad

20  in furtherance of his faith, to die a martyr and to potentially

21  leave his family, was of course of great concern and significant

22  concern.  And the reason why I say that is that S-1 has been

23  designated by the United States as a Specially Designated Global

24  Terrorist.  And in that finding, I just want to read to the

25  Court what the OFAC, the Office of Foreign Assets Control,

stated about S-1.

THE COURT:  If you could just read slowly so that my court reporter can get you.

MR. CHAWLA:  Yes, Your Honor.

THE COURT:  Thank you.

MR. CHAWLA:  "A Jamaican-based Islamic cleric who provided recruitment services to the Islamic State of Iraq and Syria (ISIS).  S-1 has recruited for and provided support to ISIS, and his actions have influenced terrorists who engaged in bomb plots and other horrific acts on innocent civilians," said OFAC Director John E. Smith.  "This designation will help deter S-1's global following, prevent U.S. persons from supporting him in any manner."

On August 25, 2017, the New York County District Attorney's Office for the State of New York unsealed an indictment charging S-1 with recruiting and providing support for those seeking to commit acts of violent terrorism in connection with ISIS.

S-1 facilitated and helped connect ISIS recruits with those who could arrange travel and entry into ISIS-controlled territory in order to join ISIS.  Moreover, he helped hide those seeking to join ISIS or travel to ISIS-controlled territory.

S-1 is an ISIS-trusted individual who has vouched for those seeking to join ISIS.  In 2016, S-1 assisted one of his followers in identifying a funding source to travel to ISIS-controlled territory.

S-1 also arranged marriages for the purpose of assisting couples to travel to ISIS-controlled territory.  S-1 performed the marriage ceremony for an individual who was later convicted for supporting ISIS, who believed that a marriage certificate from S-1 would help provide verification in ISIS territory if the individual's spouse was killed.

In addition to those actions for ISIS, S-1 has directly or indirectly influenced numerous terrorists including the Ohio State University attacker during Thanksgiving weekend in 2016; a Garland, Texas, shooter at a Mohammed drawing contest in 2015; Faisal Shahzad, the attempted Times Square bomber in New York City in 2010; Mohammed Chowdhury, who planned and attempted to bomb the London Stock Exchange in 2010; Umar Farouk Abdulmutallab, the underwear bomber who attempted to down an airliner over Detroit, Michigan, in 2009; two of the four bombers of the July 7, 2005, bombings in London; and Richard Reid, the 2001 shoe bomber.

S-1 is a very dangerous person.  He seeks and preys upon persons like Mr. Khan, people who have an ideology, people who are looking for direction and guidance drawn to this ideology and may in fact want to fight and go abroad.

And that is what Mr. Khan was doing.  He was having communications with the sheikh about this, and he moved from an e-mail to an encrypted application service, MA, which is in the materials the Court is aware of.  When the FBI asked him

about S-1, asked about his connections with him, about his
communications with him, he lied.  He lied repeatedly.  He
lied multiple times over multiple days.

And what gives the government cause for concern today at
this sentencing is the defendant's letter in which he says he
blames the reason for his false statements on, I felt pressure
in the room and I felt anxiety, and the way they were going
about it made me lie.

That's not accurate in terms of what actually happened.
What actually happened was in the first interview, July 31,
2017, the FBI interviewed him and asked him gently about S-1
and asked him about whether or not he had given money to
anyone outside the United States.  He omitted the sheikh, S-1.
He omitted S-1 as a contact point.

Then, immediately after the interview, he started
communicating with S-1.  And in those communications, he laid
out that "the FBI was asking about you."  S-1 told Mr. Khan to
lie.  He said, Don't say you gave money to me, because you
didn't give it to me in my name; you used my spouse's name, not
mine.  He instructed him to lie.  He also said, Are they going
to arrest you?  He asked a number of questions which led
Mr. Khan to believe that he may be in trouble.

Mr. Khan was reacting to S-1, not the FBI.  The fact that
he in his mind still believes that it's the FBI's fault, not his
own or perhaps S-1 who was causing it, makes me believe and

gives the government pause that he might fall victim again in the future to somebody like S-1 who is on the Internet, which educates, I think, part of the reason why the government spent so much time on special conditions.

I know this Court has seen many a sentencing where we don't even talk about conditions of supervised release. But here, this is the main rehabilitative aspect for him because, as he sits here today, he did not commit a violent crime. He didn't actually hurt anybody. Didn't harm anybody.

This is not a thought crime, though, because he lied and obstructed justice, and he deleted lots of materials. And I think it's important for the Court to appreciate that his lying about it was material and important to the investigation.

As I laid out, in 2016, S-1 was involved in communicating with lots of people, bringing lots of people to ISIS territory. He was involved in doing a number of those things. When the FBI came calling to Mr. Khan, they asked him about his communications with S-1 over the encrypted application.

Because he deleted them, the FBI did not have those records, did not have those communications until many months later. And so that's the reason why he had a material impact on this investigation, not only of himself, but also S-1 and his numerous contacts with lots of other people.

The fact that S-1 told Mr. Khan to lie is a very important fact. And the fact that he followed through with it was of even

1   greater concern, and it's the reason why I believe that we do

2   need to have a period of incarceration that's a little larger

3   than the 18 months.  We're recommending 20 months at this time.

4          THE COURT:  That's not what you said in your

5   sentencing memorandum.  You asked for 18 months.

6          MR. CHAWLA:  No, I think I said in the sentencing

7   memorandum -- in the supplement we stated we would alert the

8   Court to within the range after we alert you to defendant's --

9          THE COURT:  Okay.

10          MR. CHAWLA:  -- after we reviewed the defendant's

11   plan.  The family had a plan that they were going to come up

12   with related to his rehabilitative aspect, and in the memorandum

13   we stated we were going to await the review of their -- and I

14   can show the Court.

15          THE COURT:  Yes.  The supplemental did not mention...

16          MR. CHAWLA:  Court's indulgence.

17      On page 12 of the government's memorandum, this is the main

18   memorandum, sentence 2 under paragraph B --

19          THE COURT:  Right.  The government believes that it

20   merits a downward departure of 10 levels, which is an 18 to

21   24 month guideline range.  Okay.  I see here.

22          MR. CHAWLA:  And below that, the government will

23   provide a specific allocution --

24          THE COURT:  Okay.

25          THE CHAWLA:  -- within the range after completion

1    of the family plan of additional supervision --

2              THE COURT:  Okay.

3              MR. CHAWLA:  -- to supplement.  So I apologize if --

4              THE COURT:  That' s all right.  I read it wrong.

5              MR. CHAWLA:  Yes, Your Honor.

6        So in terms of where we are today, Mr. Khan has engaged in

7    serious conduct, which would normally merit the 70 to 71 months.

8    As we alerted the Court, though, the cooperation was significant.

9    We do believe that the downward departure is merited.  The

10   government has taken that into account in terms of its view.

11   Mr. Benowitz had mentioned in his papers as well the fact that

12   he cooperated indicated that he's less likely to recidivise.

13       The government's concern comes in part from the fact that

14   radicalization today and the way we view radicalization is very

15   different than it used to be.  It used to be, after 9/11, it

16   would take months, maybe a year, to get someone radicalized to

17   the point of actually committing an attack.  But now we know

18   that's not true.

19       ISIS-inspired attacks, both here and in Europe, have shown

20   us that radicalization can happen very quickly.  The spike can

21   happen within just days.  If the person has the right mindset,

22   if they're properly motivated or they feel like they're

23   retaliating for some event or called upon by a person they

24   respect to do it, it can happen very fast.  So that's why we're

25   looking at the risk factor for him, how we should handle him

1    moving forward.

2        And so to that point, we think that the 20 months would

3    allow Mr. Khan additional time to understand how serious this

4    crime was, understand that it was not the FBI's fault, but

5    really, he has to dig deep and understand this was S-1's fault

6    in part.  S-1 called upon him to delete the messages, called

7    upon him to take action.  In fact, he did take some action, then

8    lied about it repeatedly.

9        This would give him some additional time to reflect before

10   being released.  He has served approximately 13 months as of

11   today, I believe, so that even if he's getting 20 percent

12   credit, an additional 20 months is probably only -- a 20-month

13   sentence would only be about an additional six months or five

14   months at most in terms of additional time.  But we do think

15   that's an appropriate amount of time for him to reflect and

16   understand how serious this is so that when he is on supervised

17   release he won't recommit and reoffend.

18       I think that the government and defense counsel have

19   worked together to try to find a solution for supervised release

20   conditions that will minimize his risk factor for radicalization,

21   meaning putting him in a place where he's not going to be

22   radicalized to the point of danger.  And that is, in part, with

23   the family's assistance and help, which I would commend.

24       They have, in fact, made strides to make sure Mr. Khan can

25   get those services when he's released, that he can have access

1    to somebody who can provide him level thinking on these issues.

2    And again -- and I made mention of this at the last hearing --

3    we're not the thought police.  We're not trying to stop him from

4    thinking a certain way or believing a certain way about his

5    religion or his faith.  He can.  We just want to make sure that

6    when he's released he doesn't become radicalized to the point of

7    potentially committing an attack.  And that's a fine line.

8         The fact that he would voluntarily accept that condition

9    we think would make this an appropriate condition, if he were

10   to accept it, meaning follow the family's recommended path, and

11   that includes, No. 1, having mentoring with his brother-in-law

12   for two times a week, and as a family plan, of counseling with

13   Ms. Safiya Samman and to follow her instruction for a period of

14   one year.  So, in other words, this deradicalization effort or

15   plan would be, in part, family-based --

16            THE COURT:  And this is a condition of supervised

17   release?

18            MR. CHAWLA:  It would be.  In addition, however,

19   Probation would be taking on additional work to assist in

20   finding someone to do mental health and drug counseling, because

21   he has had a drug problem in the past.  So dealing with those

22   two issues together, getting him on a medication schedule that

23   works, with a professional providing that information through

24   Probation, we think is an appropriate way to do it.  The family

25   comes up with options and ideas and Probation blesses it, the

1    government doesn't have any objection to that.

2        What we are asking, though, is the Court take into account

3    a number of the other special conditions, which this is the part

4    where normally we're talking about this in the sexual-predator

5    context, online activities and monitoring and what that would

6    mean, because he had done a lot of this activity online.

7    He was living at home at the time he was doing all of this.

8        The fact that he was radicalizing in his family's presence

9    -- because it's so easy these days to pick up a phone, go into

10   a corner and go off by yourself, no one's monitoring you, no

11   one knows what you're doing.  And especially these days, with

12   Tor and with dark web browsing, it would be very hard to monitor

13   and follow somebody unless they have special conditions.

14       So the government has laid it out in its papers, but we

15   do believe that, in addition to the other conditions that we've

16   talked about, that No. 1, he refrain from any kind of contact,

17   directly or indirectly, with S-1, S-1's family, or any person

18   who's been designated as an SDGT, Specially Designated Global

19   Terrorist, through any medium including social media.

20       This includes ISIS members that are known ISIS members

21   online.  And, unfortunately, there are a number of them.  They

22   were on Twitter for a number of years.  They used social media

23   accounts to communicate.  So we think that's an important

24   condition.

25       No. 2.  He refrain from viewing, reading, or watching --

or reviewing material, videos, lectures, or books created,
authored, or dictated by S-1 or any person designated by the
United States as a Specially Designated Global Terrorist.

This also includes Anwar al-Awlaki.  Mr. Khan regularly
listened to Anwar al-Awlaki before he started following S-1,
and he actually had a web page where he put on a number of
Awlaki videos on his website to promote and push out Anwar
al-Awlaki's message.  Not all of them were of the radical type;
there were some other lectures he'd done on Islamic study.  But
again, it's to keep him away from targets or places where he
could be radicalized.

No. 3.  That he agree to Probation's ability to monitor and
search his computer and electronic devices, including any mobile
phone, and to monitor his access to restricted persons and
restricted material.

No. 4.  That he take a polygraph as requested by Probation
to ensure his compliance.

No. 5.  He agree to a search of his residence as requested
by Probation to ensure his compliance with his conditions.

No. 6.  He engage in the terrorism treatment program we've
discussed run by the family.

No. 7.  That he refrain from communicating online in a
foreign language without prior approval from Probation.  And
again, this is in part because he does speak multiple foreign
languages.  If Probation were to try to follow and understand

what's happening -- I have no problem with him communicating in a foreign language.  I want to -- I want to encourage him to do that.  I just want Probation to know about it in advance.

No. 8.  That he agree to location monitoring and remain in the Washington, D.C., Maryland, and Virginia area unless agreed to by Probation or the Court.

No. 9.  That he refrain from international travel without court approval.

No. 10.  That he perform 250 hours of community service. We think that he has been given a significant break from his conduct based upon his cooperation.  His opportunity to take advantage of it with his family's help, we're hopeful that he'll get to that point, but we don't have a lot of confidence that if he was left to the regular conditions of supervised release that that would work, in part because -- and we've put this in the papers -- radical Islamists who go back on release don't have the same risk factors that other people do when seeing if they're going to recidivise.

They don't do drugs regularly.  They don't drink a lot of alcohol.  They're not out with other criminals, other criminal elements.  They're going to church regularly.  They're otherwise going about their daily routine, until they decide to do something else.  So the normal recidivism risk factors that you look for for a normal person who's committed a crime don't apply to persons in this particular context.  So that's why we do ask for

1  these otherwise special conditions of supervised release.

2          THE COURT:  All right.  Thank you, Mr. Chawla.

3          MR. CHAWLA:  Thank you, Your Honor.

4          THE COURT:  Mr. Benowitz?

5          MR. BENOWITZ:  Yes, Your Honor.

6      May I just have one moment?

7          THE COURT:  Yes.

8      (Counsel conferring with defendant.)

9          MR. BENOWITZ:  Thank you, Your Honor.  I think

10  the government has focused much on Mr. Khan's letter which

11  I read a little bit differently than the government does.

12      You know, first the government says that the FBI gently

13  spoke with Mr. Khan.  I don't know that that's possible.  You

14  know, when there are multiple agents --

15          THE COURT:  Certainly they are capable of ratcheting

16  up their level of intensity.

17          MR. BENOWITZ:  Yes.  But I think, certainly, given

18  Mr. Khan's mental health history, there really isn't such a

19  thing as a gentle questioning.

20          THE COURT:  Yeah, I think I can put Mr. Khan's letter

21  in the proper context.  It wouldn't be the first letter that you

22  or I have seen from a defendant in which they -- not minimize

23  but attempt to justify or explain --

24          MR. BENOWITZ:  Right.

25          THE COURT:  -- their actions.  But I can certainly

1   put that into context with the rest of the facts in this case.

2        MR. BENOWITZ:   Correct.   And I can say that

3   Mr. Khan and I have had many conversations about S-1's role

4   in using Mr. Khan throughout this entire incident or series

5   of incidents.   Mr. Khan recognizes that he was used.   He also

6   recognizes what a serious offense this is.

7        And given what he did to make things right, as I said at

8   the bench, I think the deterrence factor is very strong here

9   because, as the government recognizes, what Mr. Khan did is

10  very rare, and it makes him very vulnerable when he's out in

11  the community were he to reengage with the people he shouldn't

12  be engaging with and shouldn't have engaged with to begin with

13  in that context.

14       Mr. Khan's also been at the D.C. jail for 13 months in a

15  maximum-security setting.   And as I'm sure the Court recalls, at

16  our last hearing, when we were talking about moving Mr. Khan and

17  it turns out he was ineligible to be moved to CTF for, frankly,

18  an unknown reason, he was given an option to moving to either

19  Northern Neck, or I believe to Orange, both of which I've had

20  experience with other clients, which are unbelievably bad places

21  for people of the Muslim faith, which is why I did not -- I

22  recommended to Mr. Khan that he not move to either facility.

23  Just from experience with other clients who have been unable to

24  get the food that they want, who have been verbally abused by

25  guards, it's just not the place for him to be.

But he has been in a maximum-security setting for 13 months, which I think is also hugely important when we're talking about deterrence, because Mr. Khan knows what would happen if he violates the law again.  I think that the plan that we put together is a good one given the circumstances here, given the closeness that Mr. Khan has with his family.

I think that we all understand that this happened while Mr. Khan was in the home.  He was communicating while in the home.  So I think outside sources are important, like Dr. Samman, who has a long history with the family, not necessarily personally with Mr. Khan, but they know each other and Mr. Khan respects Dr. Samman.  So I think that that's somebody that he can rely on for counseling, and also Dr. Samman has experience with these types of deradicalization programs.

Mr. Khan has a plan.  He has one class to finish at Northern Virginia Community College to get his associate's degree, and then his plan is to try and attend George Mason to get a degree in information technology.  He will remain close with his family, and his family is very committed to keeping Mr. Khan in a stable setting.  And I think that's also very, very important.

The issue that we've run into is identifying a therapist given Mr. Khan's insurance situation.  He's on Medicaid, so I don't think it made -- or I didn't think it made sense to find someone private, just given the fact that most people don't take

1    Medicaid.  So I think it's best left up to Probation to identify

2    a therapist that he can go to.

3        I also -- I understand the government's concern about

4    having Mr. Khan really think about what he's done.  He's had

5    13 months to do that, in a very, very restrictive setting.  As

6    the Court knows, he would get 15 percent off for good behavior

7    almost immediately given that he's been incarcerated for 13

8    months.  So if the Court were to give him 18 months, he would

9    get approximately between two and a half and three months'

10   credit at that point.  So we're really talking about 90 days

11   of additional incarceration at 18 months.  At --

12           THE COURT:  You'll agree, Mr. Benowitz, that he hasn't

13   had the benefit, though, as awful as maximum security at the

14   D.C. jail is -- and it is awful -- he has not had the benefit of

15   the Federal Bureau of Prisons' anti-extremism counseling and

16   programs.  He hasn't had that benefit.  And sometimes an

17   extended period of confinement in a place like the D.C. jail's

18   maximum-security wing can strengthen beliefs that may not be --

19   you know, may have got him in this position.

20       I mean, look.  This is an area in which we're going to need

21   more and more -- the federal system is going to need more and

22   more resources, because this is not the first or last person

23   that's going to come before the court in need of -- at the point

24   where they can be, you know, turned around.

25           MR. BENOWITZ:  Sure.

1        THE COURT:  And so while -- that's one position.

2   That's one of the things I asked Probation about this morning.

3   I said, you know, does the Bureau of Prisons have programs like

4   this?  And I was told that they do.  So that's one factor I'm

5   considering.

6        MR. BENOWITZ:  I understand, Your Honor.  I think,

7   though, that given Mr. Khan's -- and I don't know the statistics

8   on this.  I don't know what the statistics are on how many

9   people in federal deradicalization programs cooperated.  And I

10  think that's the key difference because -- and, again, I don't

11  have the stats on this, but given what the government is saying

12  about how hard it is to get people to actually engage, I think --

13       THE COURT:  No, I think he's motivated.

14       MR. BENOWITZ:  He's motivated, but there are a lot

15  of people who are motivated that don't take the step.

16       THE COURT:  Right.

17       MR. BENOWITZ:  And he took that step, and he knows

18  how vulnerable he is.  So I think the last thing that Mr. Khan

19  wants to do is put himself in a position or put his family in a

20  position where they're vulnerable, and I think in this specific

21  case, I think that's of paramount importance.

22       THE COURT:  Okay.

23       MR. BENOWITZ:  So I think -- you know, I understand

24  the Court's position and what the Court is considering, but

25  I think that the difference between 20 months versus 18 months

versus time served is not substantial.  And I think at this

point, given where he's been and what he's done, it would be

best to put him back in the community and implement the plan.

THE COURT:  Okay.  Thank you, Mr. Benowitz.

Mr. Khan, do you have anything you want to say?  Like I

say, you don't have to, and I won't hold it against you if you

don't.  But I will listen to you if you do.

MR. BENOWITZ:  Just one moment.

(Counsel conferring with defendant.)

MR. BENOWITZ:  I don't think Mr. Khan has anything

to add.  I think he's feeling a little bit nervous.

THE COURT:  Mr. Khan, do you have anything you want

to tell me?

THE DEFENDANT:  No, Your Honor.

THE COURT:  All right.

After calculating the sentencing guidelines and departures

and applying the 10-level departure in this case and hearing

the statements made by counsel and reviewing the letters from

Mr. Khan's family and Mr. Khan himself and friends, I have to

consider the relevant factors set out by Congress in 18 U.S.C.

§ 3553(a) to ensure that I impose a sentence sufficient but not

greater than necessary to comply with the purposes of sentencing.

These purposes include the need for the sentence to reflect

the seriousness of the offense, to promote respect for the law,

and to provide just punishment.  The sentence should also deter

1  criminal conduct, to protect the public from future crimes by

2  the defendant, and promote rehabilitation.

3  I also have to consider the nature and circumstances of the

4  offense, the history and characters of Mr. Khan, the types of

5  sentences available, and the need to avoid unwarranted sentence

6  disparities among similar defendants with similar records who

7  have been found guilty of similar conduct.  Restitution is not

8  an issue here, and I've considered all of these.

9  This is a difficult case.  I'll start by saying that

10  I think both counsel in this case, both Mr. Chawla and

11  Mr. Benowitz, have labored very diligently and have treated you

12  very fairly and -- well, obviously, Mr. Benowitz has fought very

13  hard for you, but I think all sides in this case have tried to

14  view your case as an individual case with unique facts and to

15  treat you fairly.

16  Which is interesting, Mr. Khan, because if you look around

17  in this courtroom, you will see people of all different races,

18  ethnicities, nationalities, gender, working together, many of

19  whom worked together to try and help you.  You communicated with

20  an individual online and expressed support for an ideology which

21  would kill nonbelievers, children, women, which was comfortable

22  with the notion of even killing members of your own faith as

23  collateral damage in a Jihad war.

24  And you did that all the time while living with your

25  family, working in the community, and seemingly working in an

environment that values diversity and religious freedom in a community in which the majority of your Muslim community are just working peacefully, raising their families, with malice and hatred towards no one.

In communicating with S-1 and attempting to give him financial support and reaching out to him, you participated, in a very small way but not insignificant way, in the perpetuation of international terrorism.  And though it might seem to you -- sitting in your home, looking at a computer of videos of people getting blown up or beheaded -- that that's far away, you're still playing a role.

When you send money to S-1, when you attempted to send money, no matter how small that financial contribution was, you were helping to perpetuate a system that is frankly wreaking terror and havoc and death amongst your own brothers and sisters.

So when the FBI asked you whether you had communicated with S-1 and you told them on several occasions you had not, whether they spoke to you gently or not, you knew you had been ordered to lie, and you knew that in lying you were protecting S-1. I don't think you realized how much trouble you were getting yourself in, but you were protecting somebody who has openly advocated and repeatedly continues to advocate for the killing of hundreds and thousands of innocent people.

Over the course of four years, you exchanged at least 33 e-mails and over 1,000 encrypted messages with S-1.  You also

knew that you had sent money to him on multiple occasions.   And

I say this because I have received letters from your family and

friends that talk about what a loving and kind person you are

and what a good brother and a good son you are, and I have no

doubt that that is true.

But what I have found is that those two people can coexist

and often do.   You can be a loving brother, a good husband, a

loving father, and still be engaged in this kind of activity.

Those two aren't mutually exclusive.   And that is what you were

doing.

And I don't think your family really knew, or even knows

still, how serious the behavior that you were engaged in was.

You weren't just dabbling and surfing the Internet.   You had

taken a step.   You had asked: How can I become a martyr?   How

can I help?   That's taking a very serious step.

And not only had you made inquiries to find out how you

could help, you started to help by sending money, by lying to

protect S-1.   If you had not been intercepted and questioned,

where would this have ended?   With you on a plane to Turkey,

with your wife and children left without a husband and father?

This is no innocent flirtation with extremism, Mr. Khan.

This was years.   This started in 2016.   And although I know it

doesn't seem that way, you have had 13 months in the D.C. jail

to realize how much worse it could have been.   And as the

government pointed out, even if you never planned to go through

1    with what you were asking to do -- and we don't know.  We don't

2    know where it would have ended.  But even if you were just

3    talking, you were sending money.

4        Your actions -- the time and the resources that the

5    government had to spend investigating your actions took time

6    and resources away from them investigating other terrorists,

7    including, I might add, terrorists who seek to attack right here

8    in America, of which apparently there are many.

9        Turning to your characteristics as an offender, you were

10   raised by your parents in a loving home.  You had everything you

11   needed.  As your sister has said in her letter, you had everything

12   you ever needed.  You had love and support.  And you still do.

13   You see your family sitting here for you.

14       I can tell you, many, many people who sit in my courtroom

15   have nobody.  The fact that you have a loving family who's ready

16   to help in any way they can is a good factor as far as your

17   rehabilitation goes, but it also doesn't explain why you chose

18   the path you did.

19       You've worked.  You've almost finished your requirements

20   for an associate's degree.  You have a wife who loves you and

21   two children, one who adores you, one you haven't met yet.  And

22   I agree that you're remorseful.  I agree that you regret your

23   actions.  And you have people in the community like Mr. Gumus,

24   your prayer leader, who want to help and guide you to get onto

25   the right path, but you're not going to be able to get on that

1    path until you get treatment not only for your extremism but

2    for your mental health issues.

3         Mr. Khan, based on what I've reviewed in this record, it

4    seems to the Court that a combination of your mental health

5    issues -- you're lost.  You are looking for something, and you

6    seem to have found solace, support, camaraderie, friendship,

7    I don't know what, in this online extremist community.  I think

8    you're still searching.  I think you're still lost.

9         And my concern, one which I shared with Probation and I'm

10   sharing with you now, is that with this system taken away from

11   you, you have to have something to replace it.  And so my

12   concern is that you receive the mental health treatment you need

13   so you don't go looking for help through marijuana use, through

14   people on the Internet telling you that you're going to go to --

15   you know -- paradise if you commit Jihad.  I want to make sure

16   that your mind is clear enough that you can stay on the right

17   path.  You understand?

18             THE DEFENDANT:  Yes.

19             THE COURT:  One of the other factors I also have to

20   consider is the need to avoid unwarranted disparity, which is a

21   factor that is important in almost all sentences.  I've looked

22   into some of the sentences.  This is sort of an unusual case,

23   but I have found that, across the country, individuals sentenced

24   under §2J1.2 received an average and median sentence of 17 and

25   12 months respectively.  Across the country, individuals

1   sentenced under §2J1.2 with a criminal history category of

2   I received an average median sentence of 10 and 7 months

3   respectively.

4        Mr. Benowitz, you touched on something that I often wrestle

5   with, which is what's really the difference between 18 and 20

6   months, you know, especially when you consider good-time credit?

7   If somebody doesn't get it, is two months more really going to

8   help them get it?  But this is one of those situations where

9   I think it does make a difference, and let me tell you why.

10   And I said it earlier.

11        He's been in maximum security at the D.C. jail.  He

12   hasn't had the benefit of the anti-extremism and mental health

13   counseling that he needs desperately.  And I don't have any

14   doubt that the plan you all have agreed to with the family is

15   a good one.  And I am going to impose it.  I want him to do that

16   when he gets out.

17        But I do believe that the federal system, the Bureau of

18   Prisons' federal system, does have resources that could help

19   Mr. Khan, and I think even -- every day of treatment that he

20   could get in the federal system that he hasn't gotten in the

21   last 13 months would put him on the road to greater success once

22   he's released.  It may only be a few months, but I think it's

23   better than nothing and it can only help.

24        Mr. Khan, you are right on the edge.  You could go either

25   way right now.  You understand?  You could go down the right

path, get your family support, get your counseling, see where

you had gone wrong, and become a productive citizen.  Okay?

Or you could get even deeper into it, into extremism.

I want to make sure that you take the right path.  I want

to make sure that you have the tools to do that.  I don't think

you've been given the counseling and the treatment that you need

in the D.C. jail, and I think that the Federal Bureau of Prisons

does have some ability in this particular case to help you.

So having considered all these factors, the Court believes

that a penalty of 20 months is sufficient but not greater than

necessary to reflect the seriousness of the instant offense, to

promote deterrence, to protect the public from future crimes

that may be committed by the defendant, and to avoid unwarranted

disparities among defendants convicted of similar crimes.  I'm

going to recommend that you be placed in a federal facility that

provides extremism counseling and treatment.

Therefore, based on my consideration of the 3553(a)

factors, I'll now state the sentence to be imposed.  Stand

up with your lawyer.  (Defendant complies.)

It is the judgment of the Court that you, Masoud Khan, are

hereby committed to the custody of the Bureau of Prisons for a

term of 20 months on the sole count of the information.  You're

further sentenced to serve 36 months of supervised release and

to pay a $100 special assessment in accordance with 18 U.S.C.

§ 3013.  The Court finds that you do not have the ability to pay

a fine and therefore waives imposition of a fine in this case.

The special assessment of $100 is immediately payable to the Clerk of the Court for the U.S. District Court of the District of Columbia.  Within 30 days of any change of address, you shall notify the Clerk of the Court of the change until such time as the financial obligation is paid in full.

The Court will recommend to the Bureau of Prisons that you be considered eligible for educational and vocational programs as well as extremism counseling and treatment while you are incarcerated.  The Court will also recommend to the Bureau of Prisons that you be prioritized for mental health treatment, specifically mental health treatment for individuals who can benefit from violent-extremism treatment.

The Court will also recommend to the BOP that you be considered eligible for the parenting program which is designed to provide inmates with information and counselling through directed classes on how to enhance their relationship with their children even while incarcerated.

Mr. Benowitz, do you have any recommendations for BOP locations?

MR. BENOWITZ:  Court's indulgence.

(Counsel conferring with defendant.)

THE COURT:  Mr. Khan, you've served about 13 months. With a sentence of 20 months considering good-time credit, you'll probably end up doing another -- five?

1           MR. BENOWITZ:  Four months.

2           THE COURT:  Four months.  Use that time.

3     Mr. Benowitz?

4           MR. BENOWITZ:  Your Honor, given the Court's

5  identification of the extremism programs, we would just

6  ask for the facility that's closest to this area.

7           THE COURT:  All right.  So I will recommend that

8  Mr. Khan serve his sentence at a facility that provides

9  extremism treatment and mental health treatment, and one that

10  is closest to this area so that he can maintain his family

11  contacts.

12     Within 72 hours of release from custody, you shall report

13  in person to the probation office in the district to which

14  you're released.  While on supervision, you shall abide by

15  the following mandatory conditions as well as the standard

16  conditions of supervision:

17     You must not commit another federal, state, or local crime.

18     You must not unlawfully possess or use a controlled

19  substance.

20     You must submit to one drug test within 15 days of

21  placement on supervision, and at least two periodic drug tests

22  thereafter as determined by the Court.

23     You must cooperate in the collection of DNA as directed by

24  the probation officer.

25     You shall abide by the following conditions:  You must

participate in an inpatient and/or outpatient substance abuse treatment program and follow the rules and regulations of that program.  The probation officer will supervise your participation in the program, and this is because of your history with marijuana.

I believe imposing substance abuse treatment is the least restrictive means of furthering your rehabilitation.  I don't think you are a drug addict per se, but I think you were using marijuana in an attempt to self-treat your mental health issues. I see that a lot.  And there are better treatments than marijuana for your mental health issues, Mr. Khan.

You must submit to substance abuse testing to determine if you've used a prohibited substance.  You must not attempt to obstruct or tamper with the testing methods.  And, again, this is the least restrictive means necessary of making sure that you remain drug free in the name of rehabilitation.

You must participate in a mental health treatment program and follow the rules and regulations of that program.  The probation officer, in consultation with the treatment provider, will supervise your participation in the program.  And, again, this is a condition of supervised release that is the least restrictive means of furthering your rehabilitation and your productive reintegration into society.

You must not incur new credit charges or open additional lines of credit without the approval of the probation officer.

1    You must provide the probation officer access to any requested

2    financial information and authorize release of any financial

3    information.  The probation office may share financial

4    information with the U.S. Attorney's Office.  And, again, this

5    is to assist the probation officer in deterring and detecting

6    economic crimes, verifying and monitoring your employment.

7          You must complete 250 hours of community service.  Again,

8    this will be supervised by the probation officer, and this will

9    benefit not only the community, but you.  You've had a chance to

10   make something of your life.  I want you, Mr. Khan, to go out

11   and share your experience and help other young people from going

12   on the path you went on.  Do you understand?

13               THE DEFENDANT:  Yes.

14               THE COURT:  The following special conditions are

15   designed to help you in your efforts not to provide material

16   support to ISIS or to similar successor foreign terrorist

17   organizations.  I'm sorry?

18               THE DEFENDANT:  I never had those kinds of thoughts

19   you were saying, that I was going to shoot people...

20               THE COURT:  No, I -- just speak into the...

21        You're saying you never had those kind of thoughts where

22   you're thinking you're going to shoot people.  No, but you were

23   watching videos, and you were expressing support for an

24   organization that does hurt people.  Right?

25               THE DEFENDANT:  I wasn't supporting the violence.

1    The person S-1 even stated himself that if you live in the

2    United States, don't shoot anybody, don't kill anybody.

3            THE COURT:  You were supporting the violence that

4    ISIS was committing in other countries.

5            THE DEFENDANT:  I wasn't supporting the violence.

6    I was just supporting... I don't know.  Doesn't matter.

7            THE COURT:  Okay.  Well, Mr. Khan, I understand your

8    position, but I disagree.  I think by engaging with S-1 and

9    sending him money and espousing the positions that I read about,

10    that you were indirectly supporting the violent activities of an

11    organization that is sworn to violence.

12    And that is what -- this is what I'm worried about.  I'm

13    worried that you don't really understand or haven't accepted the

14    true nature of your actions.  This is what I'm worried about,

15    and I want to make sure that you talk with people who can

16    explain it to you certainly better than I can.  All right?

17    You must not associate, communicate, or otherwise interact

18    with any known member of the ISIS or ISIL organization or any

19    other known or unknown terrorist organization -- this includes

20    persons who are or claim to be involved with violent acts or

21    advocating for acts of violence and any persons who are located

22    outside the United States -- without the approval of the

23    probation officer.

24    You shall not access, view, or use any online social media,

25    chat lines, blogs, instant services, SMS, MMS, digital photos,

video-sharing websites, e-mails, or any other interactive online or electronic communication applications or sites without the approval of the probation officer.

You shall not use any telecommunications application software products such as Skype, Discord, TeamSpeak, intelligent personal assistant services, or any other software that specializes in providing chat and voice calls between desktops, laptops, mobile devices, smart watches, gaming systems, smart television, smart speakers, smart appliances, private servers, or any other high-speed data processing device performing logical, arithmetic, or storage functions.

You must not enroll in any type of educational program without the approval of the probation officer.

You shall seek the prior approval of the probation office in order to possess or use any device that can access the Internet.

You must not access the Internet except for reasons approved in advance by the probation officer.

You must submit your computers, as defined in 18 U.S.C. § 1031(e)(1), or other electronic communication or data storage devices or media to a search.  You must warn any other people who use these computers or devices capable of accessing the Internet that the devices may be subject to searches pursuant to this condition.  A probation officer may conduct a search pursuant to this condition only when reasonable suspicion exists

1    that there is a violation of a condition of supervision and

2    that the computer or device contains evidence of this violation.

3    Any search will be conducted at a reasonable time and in a

4    reasonable manner.

5        You must allow the probation officer to install computer

6    monitoring software on any computer you use.

7        You must submit to periodic polygraph testing at the

8    discretion of the probation officer to ensure that you are

9    following the requirements of your supervision or treatment

10   program.

11       You shall submit your person, residence, office, vehicle,

12   or an area under your control to a search conducted by the

13   probation officer at a reasonable time and in a reasonable

14   manner based upon reasonable suspicion of contraband or evidence

15   of a supervision violation.  You shall warn any other residents

16   or third parties that the premises and the areas under your

17   control may be subject to such searches.

18       You must attend violent-extremism counseling from providers,

19   which may include religious providers, as directed by the U.S.

20   Probation Office.  The probation officer will supervise your

21   participation in the program.  To the extent that I've omitted

22   any of the plan that was reached between your lawyer and the

23   government, you must follow that treatment plan that Mr. Chawla

24   set out in his allocution.

25       To the extent that you use a foreign language to access or

1   communicate verbally over a monitored computer or other device,

2   you agree that you're prohibited from -- well, you have to

3   notify the probation officer if you are communicating with

4   individuals in a foreign language.  You'll pay for translations

5   by a third party if directed to do so, and you consent to allow

6   the FBI to review any foreign-language materials and provide

7   translations to the probation officer.

8        You shall continue to cooperate with the government as

9   directed.

10       You'll be monitored by a form of location monitoring

11   technology for a period of 180 days, and you must follow the

12   rules and regulations of that program.  The cost of the program

13   is waived.

14       You are prohibited from traveling within the United States

15   and to any foreign country without the approval of the Court.

16       The probation office shall release the presentence

17   investigation report to all appropriate agencies, which includes

18   the United States Probation Office in the approved district of

19   residence, in order to execute the sentence of the Court.

20   Treatment agencies shall return the presentence report to the

21   probation office upon the defendant's completion or termination

22   from treatment.

23       Mr. Benowitz?

24           MR. BENOWITZ:  Yes.  With respect to the polygraph

25   condition, I would just ask that we add to that that the

1    polygrapher should be someone who has the proper training

2    to deal with someone with mental health issues.

3             THE COURT:  Yes.  That's fine.

4         Do you have any objection, Mr. Chawla?

5             MR. CHAWLA:  No, Your Honor.

6             THE COURT:  Yes.  Should you be required to submit

7    to a polygraph, the person administering the polygraph should

8    be a person experienced and trained in dealing with people with

9    mental health issues.

10       Mr. Khan, pursuant to 18 U.S.C. § 3742, you have a right to

11   appeal my sentence if the period of imprisonment is longer than

12   the statutory maximum or the sentence departs upward from the

13   applicable sentencing guideline range.  If you choose to appeal,

14   you must file any appeal within 14 days after I enter judgment.

15       Under 28 U.S.C. § 2255, you also have the right to

16   challenge the conviction entered or the sentence imposed if new

17   or currently unavailable information becomes available to you or

18   on the claim that you received ineffective assistance of counsel

19   in entering a plea of guilty or in connection with sentencing.

20   If you are unable to afford the cost of an appeal, you may

21   request permission from the court to file an appeal without

22   cost to you.

23            Is there anything further?

24            MR. CHAWLA:  One moment.

25            (Government counsel conferring.)

1          MR. CHAWLA:  Your Honor, just I believe that

2    Mr. Khan's passport still remains with either him or his family.

3    Whether or not we want to give it to Probation, I defer to the

4    Court, but I just want to alert that the FBI did not have his

5    passport.

6          THE COURT:  Mr. Benowitz, do you know where the

7    passport is?

8          MR. BENOWITZ:  Court's indulgence.

9       (Counsel conferring with defendant.)

10          MR. BENOWITZ:  Your Honor, I can attempt to locate it

11    with his family.

12          THE COURT:  All right.  And you need to make sure that

13    that passport is not in Mr. Khan's possession.  You may want to

14    consult with Probation to determine who should keep that.

15          MR. BENOWITZ:  That's fine, Your Honor.  I can assert

16    pretty confidently he certainly doesn't have it now.

17          THE COURT:  Okay.

18          MR. BENOWITZ:  But I will attempt to locate it, and

19    then I will provide it to Probation.

20          THE COURT:  All right.

21       Mr. Khan, like I said, you are right on the edge.  You have

22    a lot of people who are supporting you, and you have a chance in

23    four months to turn this around, to see your children, to see

24    your family, become a person who's going in the right direction.

25          THE DEFENDANT:  I don't understand... (inaudible)

1          THE COURT:  Excuse me?  No, Mr. Khan.  I'll tell you

2     why not.  You need treatment.  You have mental health issues

3     which are unaddressed.  There are reasons why you sought out

4     contact with S-1, there are reasons why you started going down

5     the path that you did, and there are reasons why you lied to

6     the FBI about not only having contact with S-1 but also about

7     sending him money through his wife.  Okay?

8          You have to figure out why you were doing that, and you

9     have to figure out ways that you can avoid going down that road

10    again.  Do you understand?  Because you could have gone down

11    that road much further and gotten yourself killed or other

12    people killed.  You understand?  Okay.  Good luck.

13         Thank you, Mr. Chawla.

14         Thank you, Mr. Benowitz.

15         (Proceedings adjourned at 11:49 a.m.)

16

17

18

19

20

21

22

23

24

25

* * * * * *

CERTIFICATE

      I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*Bryan A. Wayne*
BRYAN A. WAYNE